**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,**<br><br>**Plaintiff,**<br>**v.**<br><br>**GETUP-UAW LOCAL 5124,**<br><br>**Defendant.** | : | **CIVIL ACTION**<br>**NO.: 2:26-cv-05658** |

**DEFENDANT'S REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

Pursuant to the Court's Individual Policies and Procedures, Defendant, GETUP-UAW Local 5124 (the "Union") submits this Memorandum of Law in reply to the Memorandum of Law of Plaintiff the Trustees of the University of Pennsylvania in Opposition to Defendant's Motion to Dismiss ("Plaintiff's Response").

## I. The University Has Agreed to Arbitrate This Dispute

Plaintiff Trustees of the University of Pennsylvania (the "University") brought this lawsuit to prevent an arbitration over whether first and second year Education Fellowship Recipients ("EFRs") in the Biomedical Graduate Studies ("BGS") PhD program who have completed their lab rotations are covered by the collective bargaining agreement between the Union and the University ("CBA"). Article 1 of the CBA is a Recognition Clause that defines the scope of its coverage. The Recognition Clause states that EFRs who "provide teaching or research services for the University" are included, but it excludes EFRs "who do not provide teaching or research services for the University" and EFRs "in lab rotations in the…first and second years of the

Biomedical Graduate Studies PhD Program[.]" Complaint Exhibit A, p. 3. On its face, the dispute is purely a matter of contract interpretation. According to the Grievance and Arbitration procedure in Article 10 of the CBA, such disputes "shall be processed in accordance" with that procedure. Complaint Exhibit A, p. 12. The grievance procedure culminates with "final, conclusive, and binding" arbitration and the CBA empowers the arbitrator with "the authority to interpret the terms of this Agreement[.]" Complaint Exhibit A, p.14.

Nevertheless, throughout Plaintiffs' Response, specifically in Parts IV, V.B., and VI, the University repeatedly claims the dispute is not arbitrable. In making these arguments, the University correctly notes that a party cannot be "required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Of course, that also means that if the parties agree to an arbitration provision that expressly covers any dispute over interpretation or application of the Agreement, then the Court must hold the parties to that agreement. *Id.* at 650. Indeed, it is well established that arbitration, not litigation, is the favored means for resolving disputes over the meaning of collective bargaining agreements. *Nolde Bros. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 254 (1977); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549 (1964); *Shaffer v. Mitchell Transp., Inc.*, 635 F.2d 261, 265 (3d Cir. 1980). The parties can even assign the issue of substantive arbitrability to an arbitrator if the agreement does so "clearly and unmistakably." *AT&T Techs*, 475 U.S. at 648. Thus, what determines the arbitrability of a dispute is the language of the arbitration clause of the CBA itself. See *Trap Rock Indus., Inc. v. Local 825, IUOE*, 982 F.2d 884, 888 (3d Cir. 1992) ("courts must carefully analyze the contractual language to determine whether a particular dispute is arbitrable.")

In this case, the language is absolutely clear: Article 10 of the CBA broadly defines a "grievance" that is subject to that arbitration clause as any "claim or dispute regarding the interpretation, application, or alleged violation of specific terms or provisions of this Agreement." The CBA further requires that such dispute "shall be processed in accordance with the procedures outlined" in the grievance and arbitration procedure. Complaint, Exhibit A at p. 12. The dispute over whether an issue is arbitrable is absolutely a dispute over the interpretation and application of specific terms of the CBA. Those specific terms are the recognition clause in Article 1 and the arbitration clause in Article 10. The language defining the scope of the arbitration clause is broad and mandatory. There is nothing in the CBA that excludes the Recognition Clause from the broad authority of the arbitrator.[1] Moreover, the law is clear that any doubts over whether an issue is arbitrable "should be resolved in favor of coverage." *AT&T*, 475 U.S. at 650.

To avoid the conclusion that this is exactly the kind of dispute that the University agreed to arbitrate when it agreed to the Grievance and Arbitration provisions in the CBA, the University repeatedly and falsely asserts that the CBA excludes all first and second year BGS students. See Response p. 16 ("The CBA expressly places first and second year BGS students outside the unit."), pp. 20-21 ("Article 1 [of the CBA] expressly excludes first and second year BGS students"), p. 22 ("the question here… is whether the CBA covers first and second year BGS students at all"). Those claims are directly contradicted by the language of Article 1 of the CBA. The recognition clause language only excludes EFRs who are "in lab rotations" during the

---

[1] As previously noted, the CBA expressly excludes from the arbitration provision disputes over family and parental leave decisions under Article 18, §6(C)(b) and decisions regarding alternate employment for workers who are unable to return to the United States because of their immigration status under Article 24 §2. (Complaint Exhibit A, pp. 24 & 32). See Defendant's Opening Brief at p. 8.

first and second year in the BGS program. Complaint Exhibit A, p. 3. That language is not a blanket exclusion of all first and second year BGS students. If it did, the Recognition Clause would not have made any mention of lab rotations.[2] The University seeks to avoid the obvious conclusion that a grievance that references specific language in the CBA is exactly the sort of contract interpretation the parties agreed must be adjudicated through the Grievance and Arbitration procedure by falsely claiming that those EFRs do not exist. If they did not exist, the words "in lab rotations" in the exclusion portion of the Recognition Clause would have no meaning.

## II. The Inclusion or Exclusion of EFRs Can Be Adjudicated by an Arbitrator

The University argues that first and second year BGS students are not statutory "employees" and thus their inclusion or exclusion from the CBA is not a contract interpretation issue. Plaintiff's Response at Part V.A. (pp. 11-15). In Defendant's Memorandum of Law in Support of Motion to Dismiss ("Defendant's Opening Brief") we anticipated this argument and noted that argument was rejected by the court in *President & Fellows of Harvard College v.*

[2] The only time that the University addresses the fact that the grievance is specifically about EFRs who have completed their lab rotations and not all first and second year BGS students, is when the University states that "first and second year BGS students do not join labs for non-course work related purposes or provide research services until their third year." Plaintiff's Response, pp. 16-17. But that side-steps the issue raised by the grievance. Rather, the grievance asserts that the Union identified EFRs who are "providing research services who have joined labs and are no longer on lab rotation." Complaint Exhibit E. Indeed, the grievance included an attachment that identified specific examples of individuals in the first and second year of the BGS program who had completed their rotations and listed those individuals by name. While the document attached as Exhibit E to the Complaint omitted that list, it is nevertheless evident in Exhibit E that the grievance originally included an attachment. The grievance form identifies the "Grievant's name" to be: "UAW Local 5124 on behalf of the attached list of individuals and all similarly-situated individuals." (emphasis added) Whether those individuals do provide research services is a question of fact that is best left for an arbitrator to decide after the presentation of evidence at an arbitration hearing.

*Harvard Graduate Students Union – United Autoworkers*, No. 25-1598, 2026 U.S. App. LEXIS 29803 (1st Cir. Sep. 14, 2026). See Defendant's Opening Brief, pp. 9-10.

When it attempts to distinguish the *Harvard* case, the University acknowledges that the "parties 'could voluntarily agree to include non-employees within a bargaining unit.'" Plaintiff's Response, p. 20 (quoting *Harvard*, 2026 WL 2921438, at *7 n. 11, 2026 U.S. App.. LEXIS 29803, at *16 n. 11). If, as the University acknowledges, the parties *could* agree to include so-called non-employees, then the question becomes whether they *did* agree to that under the existent language in the CBA. In other words, that question is ultimately a question of contract interpretation, the province of the arbitrator, and not an issue that could only be resolved by the NLRB or the courts.

The University's other attempts to exclude *Harvard* are similarly misplaced. First, the University argues that it, unlike Harvard, "never agreed to arbitrate" the status of the EFRs at issue in the grievance. Plaintiff's Response, p. 18. But the university in *Harvard* also argued that it did not agree to arbitrate the status of the students at issue in that case. Indeed, Harvard argued that its case should be decided by looking at the NLRB's decision in *Columbia University*, 396 NLRB 1880 (2016). *Harvard*, 2026 U.S. App. LEXIS 29803, *7-8. This is the same argument, citing the same case, that the University is making here. See Plaintiff's Response, pp. 11-15. The University's argument should be rejected for the same reason that the First Circuit rejected it in *Harvard*: because the parties agreed to a recognition clause that defines the scope of the unit, there is no need to apply the common-law employment test from *Columbia*.

Second, the University claims that this case is distinguishable from *Harvard* because that case involved the interpretation of the "included" language in the recognition clause, whereas our case is over an interpretation of the "excluded" language. Plaintiff's Response, p. 18. That is a

distinction without a difference. Both the "included" and "excluded" section of the Recognition Clause are contractual language. If it is a matter of contract interpretation, then the arbitrator has the authority to interpret it, whether or not it is under the "included" or "excluded" heading. Both the "excluded" and "included" language of the Recognition Cause are terms of the CBA. Grievance and Arbitration Clause expressly states that an arbitrator "shall have the authority to interpret the terms of this Agreement[.]" Complaint, Exhibit A, p. 14.

Third, the University argues that the instant case is different from *Harvard* because "the exclusion was deliberate." Plaintiff's Response, p. 18.[3] While the Union agrees that the parties deliberately negotiated language excluding certain graduate students from the bargaining unit, the issue to be arbitrated is whether the individuals at issue in the grievance fall within that exclusion. The Union is not arguing for the abolition of the exclusion language. It is seeking to have an arbitrator adjudicate a dispute on the interpretation and application of that language, which is exactly what the Grievance and Arbitration procedure was negotiated to do.

---

[3] The University claims that the Union previously agreed to exclude first and second year BGS students during the NLRB proceedings in 2017. See Plaintiff's Response, pp. 4, 18. See also Complaint ¶¶26-28. The issue whether GETUP-UAW, the Union in this case, is the same entity as the union that filed a representation petition for University of Pennsylvania graduate workers in 2017 and whether GETUP-UAW was bound by the stipulations entered into by the union in that 2017 case, was an ongoing issue during the 2023-2024 NLRB proceedings. The Union's position was and is that the 2017 NLRB proceeding was brought by the American Federation of Teachers whereas the 2023 proceedings were brought by the United Auto Workers and that the two petitioning unions are different entities. While the Regional Director initially ruled that the Union was bound by that 2017 stipulation, that ruling was overturned by the full NLRB in its April 10, 2024 Order. See Complaint Exhibit C. In that Order, the NLRB held that the Union *was not* bound by the 2017 stipulation, although the Board declined to decide whether the there was any continuity of identity between the two unions. *Id.* at p. 1 n. 1. The University's statement that "[t]he Union conceded in 2017 that these students should be excluded" (Plaintiff's Response, p. 18) ignores the fact there is no ruling that the union in 2017 is the same as the current Union and obscures the fact that in 2024 the NLRB specifically ruled that the current Union *is not* bound by whatever the union agreed to in 2017.

**III. The University Has Not Exhausted the Remedies Under the CBA**

To counter Defendant's argument that the University is required to first exhaust the grievance and arbitration procedure under the CBA before bringing this lawsuit, the University largely reiterates its erroneous claim that the arbitration dispute is not a dispute over the interpretation and application of the CBA. However, in a footnote, the University states:

> In any event, the University followed that [grievance and arbitration] procedure: it denied the grievance as not arbitrable on May 7, 2026, it denied it again after the June 10, 2026 third-step hearing, and objected to the AAA after the Union demanded arbitration. (Compl. ¶¶64-71). Nothing remained to exhaust.

Plaintiff's Response, p. 21 n. 4.

The University's statement that "nothing remained to exhaust" is both disingenuous and misleading. After the University raised its objections as to arbitrability to AAA as pled in the Complaint, it continued to participate in the AAA process by selecting an arbitrator and then agreeing upon an arbitration hearing date. The arbitration is currently scheduled for May 21, 2027. A copy of the AAA Notice of Hearing is attached to this Reply as Exhibit A.[4] Contrary to the University's claim in its footnote, the arbitration step of the grievance and arbitration process still remains to be exhausted, and indeed, the University is already scheduled to participate in that hearing.

---

[4] While the Court is normally limited to consider the allegations set forth in the complaint, the exhibits attached to the complaint, and matters of public record when considering a Motion to Dismiss, the Court may consider other documents that are integral to the allegations in the complaint or relied upon in the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). The attached AAA Arbitration Notice of Hearing is from the arbitration case cited in Plaintiff's factual allegations in paragraphs 68-71 of the Complaint, and it bears the same AAA Case number as the number that appears on Complaint, Exhibit G.

## IV. CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendant's Opening Brief, Defendant respectfully request that this lawsuit be dismissed with prejudice, or in the alternative dismissed without prejudice until the University and Union exhaust the grievance and arbitration process.

Respectfully submitted,

SPEAR WILDERMAN, P.C.

By: */s/ Jeremy E. Meyer*
JEREMY E. MEYER, ESQUIRE
(PA Bar # 85303)
230 South Broad Street, Suite 1650
Philadelphia, PA 19102
(215) 732-0101
jmeyer@spearwilderman.com

Dated: November 11, 2026

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the date indicated below, the foregoing Defendant's Reply Memorandum of Law in Support of Motion To Dismiss was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel of record.

Dated: November 11, 2026

By: *<u>/s/ Jeremy E. Meyer</u>*
JEREMY E. MEYER